# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| ANGELA P. SANDERS             ) | |
| )| |
| Plaintiff,         ) | |
| ) | |
| v.                               ) | No. 4:12 CV 299 DDN |
| ) | |
| CAROLYN W. COLVIN,[1]          ) | |
| Acting Commissioner of Social Security,    ) | |
| ) | |
| Defendant.        ) | |

## MEMORANDUM

    This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Angela P. Sanders for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 7.)  For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I.  BACKGROUND

    Plaintiff Angela P. Sanders, who was born on March 5, 1949, filed applications for Title II and Title XVI benefits on April 2, 2009.  (Tr. 210-16.)  She alleged an onset date of disability of March 8, 2009, due to heart problems, stroke, and heart attack.  (Tr. 249-56.)  Plaintiff's applications were denied initially on August 10, 2009, and she requested a hearing before an ALJ.  (Tr. 126-130, 133-35.)

    On January 27, 2011, following a hearing, the ALJ found plaintiff was not disabled.  (Tr. 13-20.)  On December 20, 2011, the Appeals Council denied plaintiff's request for review.  (Tr. 1-3.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

    On March 8, 2009, emergency medical services took plaintiff to the emergency room.  Plaintiff complained of chest pain accompanied by chest pounding, palpitations, and diaphoresis that began while watching television at

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity.  F.R.Civ.P. 25(d).

her workplace.² Ellen Neumann, N.P., noted that plaintiff had run out of her blood pressure medication a few days earlier. Her impression was that plaintiff suffered from a non-ST elevation myocardial infarction.³ Anthony Sonn, M.D., performed a coronary angiography and found significant blockage in her right coronary artery. Dr. Sonn performed a percutaneous intervention of the right coronary artery, inserting three bare metal stents. He prescribed aspirin for life and Plavix for an indefinite period.⁴ Pranati Ivaturi, M.D., found that plaintiff suffered from sinus bradycardia during her hospital stay.⁵ On March 10, 2009, plaintiff was discharged. (Tr. 346-53, 366-67.)

On March 19, 2009, plaintiff went to the emergency room complaining of low back pain that began two days earlier, which she rated as 10 out of 10 during movement. She also complained of a brief episode of chest pain during her hospital stay. Kevin Journagan, M.D., prescribed Percocet for pain. (Tr. 372-80.)

On April 14, 2009, plaintiff went to a follow-up examination with Dr. Sonn. She complained of fatigue and sensitivity to touch throughout her body. She reported that any physical contact with her lower left leg resulted in pain that spread. Dr. Sonn assessed coronary artery disease, hypertension, dyslipidemia, tricuspid regurgitation, and renal insufficiency.⁶ He noted that plaintiff had trouble affording her medications due to lack of insurance. (Tr. 531-32.)

On July 13, 2009, plaintiff reported low strength and balance, foot weakness, and chronic numbness and tingling in her arms and legs. Dr. Glick diagnosed the symptoms as neurological. He recommended a neurological consult and a brain MRI. (Tr. 471.)

On August 4, 2009, Saul Silvermintz, M.D. performed an internal medicine examination for a disability determination. Plaintiff's chief complaints were heart problems, stroke, and heart attack. In 1996, plaintiff suffered a heart attack and received two stents. In June 2008, plaintiff suffered a mild stroke, but did not see a doctor. For two or three days, she was unable to move her legs and could not stand. She also had difficulty with her arms. However, these symptoms faded and she continued to work. In March 2009, she suffered another heart attack, received another stent, and quit working. Dr. Silvermintz noted that when she exerts herself, she experiences chest pain and shortness of breath and takes Nitroglycerin for relief. He also noted that climbing stairs causes her difficulty. (Tr. 393.)

---

² Diaphoresis is a synonym for perspiration. Stedman's Medical Dictionary, 533 (28th ed., Lippincott Williams & Wilkins 2006) (Stedman).

³ Myocardial infarction is a synonym for heart attack. Stedman at 968.

⁴ Plavix is used to treat and prevent heart attacks. WebMD, http://www.webmd.com/drugs (last visited on March 15, 2013).

⁵ Bradycardia is a slow heartbeat. Stedman at 249.

⁶ Dyslipidemia is abnormality in, or abnormal amounts of, lipids and lipoproteins in the blood. http://medical-dictionary.thefreedictionary.com/dyslipidemia (last visited on March 15, 2013).

During a physical examination, Dr. Silvermintz noted that plaintiff had developed bilateral intention tremor after her most recent heart attack.[7] Plaintiff's hands shook and were unable to grip, which caused her to drop things. When walking, she experienced pain in her left calf and ankle, which caused her to limp. Dr. Silvermintz suggested that plaintiff suffered from peripheral artery disease.[8] Plaintiff also reported intermittent pain in the knees, back, and left hip. He observed that plaintiff could not walk on her heels or toes and required assistance to recover from a supine position. His impression was that she suffered from hypertension, that she suffered from gait impairment, grip weakness, and hand intention tremors as a result of her stroke, and that she suffered from chest pains during exertion and received stents as a result of her heart attacks. (Tr. 393-95.)

On August 19, 2009, David Glick, M.D., her primary care physician, noted that plaintiff would be unable to consult a neurologist until December. Plaintiff reported continued left side pain and burning pain in her left leg. Dr. Glick found that plaintiff's left foot had a diminished pulse but maintained its strength and temperature. (Tr. 470.)

On September 11, 2009, Jesse Poblete, M.D. performed an ankle brachial index test on plaintiff. The results indicated mild obstruction of the arteries on her right side and moderate obstruction on her left side. (Tr. 485.)

On May 16, 2010, a car hit plaintiff, who was on foot, and emergency medical services took her to the emergency room. Plaintiff complained of pain in her right shoulder, left hip, and low back. Lawrence Brown, M.D., diagnosed plaintiff with a contusion and a minor head injury. (Tr. 404, 407, 436-39.)

On May 21, 2010, Dr. Glick noted plaintiff's continued weakness and motor function disturbance. He observed that her gait was slow, shuffling, and mildly labored. Plaintiff reported that pain did not significantly affect her gait. Dr. Glick recommended an MRI of her brain and cervical cord and a neurological consult. On May 26, 2010, Catherine Lowdermilk, M.D., performed an MRI scan on plaintiff's brain. Her impression was chronic ischemic change.[9] (Tr. 459, 483.)

On June 18, 2010, Dr. Glick found that the MRI scans revealed nothing acute. He noted that her symptoms seemed disproportionate to the MRI results and recommended a neurological consult. (Tr. 458.)

On August 2, 2010, plaintiff was admitted to the hospital with complaints of intermittent chest pain that began two weeks earlier. She reported dull pain in the right side of her chest and some numbness and pain in her right arm. The pain lasted between five and twenty minutes, although the frequency and duration had increased over time. Myocardial ischemia was ruled out. After Ravi Kumar Aggu Sher, M.D., recommended that she lower her Atenolol dose to alleviate her bradycardia, plaintiff had no further chest pain.[10] Dr. Dennis Knapik, M.D., thought that a

---

[7] Intention tremors are tremors that occur during the performance of precise voluntary movements, caused by disorders of the cerebellum or its connections. Stedman at 2023.

[8] Peripheral artery disease is a common circulatory problem in which narrowed arteries reduce blood flow to limbs. http://www.mayoclinic.com/health/peripheral-arterial-disease/DS00537 (last visited on March 15, 2013).

[9] Ischemia is the local loss of blood supply due to mechanical obstruction of the blood vessel. Stedman at 1001.

[10] Atenolol is used to treat heart attacks. WebMD, http://www.webmd.com/drugs (last visited on March 15, 2013).

- 3 -

musculoskeletal problem such as arthritis might have caused the chest pain. Plaintiff was discharged on August 3, 2010. (Tr. 574, 559-62.)

On August 24, 2010, Dr. Sonn performed a follow-up examination on plaintiff. She continued to report episodes of sharp discomfort that lasted for days and worsened if she became anxious or upset. Nitroglycerin failed to relieve the pain. Dr. Sonn agreed that her chest pain had a musculoskeletal origin because it could be reproduced. He also diagnosed her with lower extremity claudication.[11] He encouraged her to take ibuprofen for her chest pain and switched her Atenolol with Metroprolol.[12] (Tr. 538-40.)

On August 30, 2010, plaintiff underwent another ankle brachial index. The results indicated mild to moderate arterial insufficiency in her lower left leg at rest and a significant drop in the arterial sufficiency of both legs after exercise, which suggested proximal arterial stenosis.[13] (Tr. 586.)

On September 8, 2010, Alan Morris, M.D., performed an orthopedic examination on plaintiff for disability determination. Plaintiff complained of pain in the right shoulder that extended into her forearm. She stated that her right arm tended to cramp after ten minutes of typing and that raising either of her arms causes her pain. Plaintiff has experienced bilateral calf pain for six or seven years and a painful, "numb, dead feeling" in the bottom in her left foot for two or three years. She complained that her left foot has caused her to fall. Plaintiff reports that she can sit and stand for only fifteen minutes at a time and can only walk two blocks at a time. She stated that she can lift five to ten pounds with her left arm, but cannot carry that weight. She uses a cane four or five times a week. Plaintiff lives alone and is able to dress and bathe. She is able to keep house, but only slowly. She does not drive but is able to use public transportation. She shops with family members and buys prepared foods. (Tr. 488-89.)

During a physical examination, Dr. Morris noted that plaintiff can walk 50 feet, but has a slow and shuffling gait. She can stand but not walk on her tiptoes and cannot stand or walk on her heels. Her hand and finger control are normal, but her right hand is slower than her left hand. She has a decreased range of motion in her right shoulder and elbow. Dr. Morris' impression was limited motion of the right shoulder and possible underlying neurological deficit producing other physical symptoms. He thought that the plaintiff's upcoming scheduled neurological consult could refine his examination and diagnosis. (Tr. 489-91.)

On September 16, 2010, Dr. Sonn performed a bilateral common femoral arteriography with run-off and found significant stenosis in plaintiff's left superficial femoral artery. Plaintiff underwent a percutaneous transluminal angioplasty and received a stent in her left superficial femoral artery. (Tr. 593-96, 616.)

On September 23, 2010, plaintiff saw Austin Hake, M.D., for a neurological consult. She reported several episodes of whole body weakness lasting about 30 minutes, which she referred to as strokes. She also reported

---

[11] Claudication means walking with a limp. Stedman at 389.

[12] Metroprolol is a beta-blocker used to treat chest pain, heart failure, and high blood pressure. WebMD, http://www.webmd.com/drugs (last visited on March 15, 2013).

[13] Stenosis is the narrowing of any canal or orifice. Stedman at 1832.

episodic numbness in her hands and feet. Dr. Hake noted an exaggerated startle response on her deep tendon reflexes. Her MRI showed leukoaraiosis with juxtacortical lesions.[14] The MRI was consistent with her report of strokes but did not indicate multiple sclerosis. (Tr. 510-14.)

On September 28, 2010, Dr. Sonn performed a follow-up examination on plaintiff. She stated that her leg felt much better and that she could walk without pain. She also stated that she no longer had the dead feeling in her leg when she walked. (Tr. 542-43.)

On November 11, 2010, plaintiff reported that she continued to feel very weak and at times felt like she could collapse. Dr. Glick noted that her leg symptoms seemed disproportionate to her peripheral artery disease. He decided to wait for the results of a full neurological work-up on plaintiff and suggested psychiatric consultation as an alternative. (Tr. 502.)

On December 24, 2010, Richard Hutson, M.D., opined on plaintiff's medical records at the request of the ALJ. He found that she had no impairments and had no limitations with her hands and feet. (Tr. 641, 647.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on July 28, 2010. (Tr. 48-111.) Plaintiff testified to the following. She lives alone in an apartment. She is 60 years old. She stands at five feet, four inches and weighs about 180 pounds. She is divorced, but has two adult children. She does clerical work through AARP at Operation Excel Youth Build, but her job is not permanent. She works 25 hours a week. She also receives food stamps and has Missouri Healthnet for insurance. (Tr. 53-57.)

She attended a now-defunct college called Professional Business and received a certificate. She knows CPR and has had vocational training in home cooking, economics, clerical work, office practice, typing, and machine operations. She has trouble writing and typing because of her right hand. (Tr. 57-59.)

During her last full-time job, she worked as a home healthcare attendant at a nursing home, where she was required to lift patients. She quit after her heart attack on March 10, 2009. She previously had a heart attack in 1996, and both heart attacks required surgery for stents. The stents have helped, but she remains susceptible to anxiety attacks. She began working in health care in 2007. The work requires a CNA license, and her license is expired. (Tr. 59-61, 68.)

In 2006, she worked in data entry, which required her to type. From 2000 to 2005, she worked full-time as a telemarketer. She is unsure whether she could return to telemarketing or data entry because she might have trouble remembering scripts and operating keyboards. From 1998 to 1999, she worked as a switch board operator with the Board of Education. From 1995 to 2000, she worked as a receptionist with the Missouri Department of Health, where she operated switch boards, assisted customers, and set up meetings. (Tr. 62-66.)

At her current job at Operation Excel Youth Build, she files and answers phones, but does not do computer work because of her right arm. She is permitted to work at her own pace. When she moves files, she typically moves

---

[14] Leukoaraiosis is decreased vascular density, especially in deep white matter in the brain. Stedman at 1074.

- 5 -

them one at a time.  She alternates between sitting and standing.  (Tr. 69-70, 98-99.)

Since a car hit her earlier in the year, her right side has troubled her.  She falls when she tries to lift her left foot too high, and canes do not help her.  Her legs frequently cause her problems.  When she walks, her legs cramp and she cannot lift her left foot.  Sometimes people with her will inadvertently abandon her because of her slow pace.  Her slow pace has also caused her to miss the bus.  When she sits, she tries to keep her feet elevated.  (Tr. 70-71, 101-03.)

On a typical day, she awakens at 5:00 a.m.  She prepares her meals.  She works four days a week and must arrive by 8:00 a.m.  She takes the bus to get to work, and she goes home at 2:00 p.m.  If she does not have to go to work, she takes her time doing what she wants.  She waits for her children to visit to do her laundry so that they can carry the laundry downstairs.  She washes her dishes and makes her bed.  She can vacuum, but she is unsure whether she could handle a broom.  She shops with assistance and cannot carry more than a few light items.  (Tr. 72-75.)

She occasionally does water aerobics with other senior citizens.  She has a driver's license, but has had no car since she experienced a blackout that resulted in an accident.  She gets along with her two children and also has grandchildren and great grandchildren.  She babysits her great grandchildren but cannot lift them.  Although she leaves work at 2:00 p.m., she usually arrives home at 4:00 p.m. because of the bus ride.  When she arrives home, she tries to relax and might prepare something to eat, such as a salad.  She attends prayer services on Wednesdays and choir rehearsals on Mondays and Wednesdays.  Typically, her friend takes her, but sometimes she takes the bus.  Occasionally, she eats out.  She usually stays at her house on the weekends.  (Tr. 76-80.)

She does not attend many outdoor culture activities because she is unable to walk quickly, but she would if she had a date or someone to hold while walking.  Other than singing, she has no hobbies, but she used to play volleyball.  She sits in a chair while she showers.  (Tr. 80-81.)

She used to drink but stopped about a year ago because drinking did not help her.  She used marijuana three or four years ago.  She takes Accupril and Atenelol for high blood pressure, aspirin and Pravastatin for her heart, Nitrostat for chest pain, Plavin to thin her blood, Gabapentin for cholesterol, Centrisi for asthma, and Tylenol for pain.  She stopped taking Lipitor because it made her intolerant to being touched.  (Tr. 81-90.)

Her body aches because of arthritis, and she has osteoarthritis in her left leg.  She will see a neurologist in September to diagnose the pain, weakness, and her inability to control her right arm.  She has trouble gripping but can slowly zip and button.  She can use utensils and comb her hair.  Putting on her socks causes difficulty, but she is able to put on her shoes.  (Tr. 91-94.)

Sometimes she watches television, and her favorite program is Law and Order.  She reads novels, which she gets from the library.  She knows how to use a computer but does not own one.  Her concentration is short.  She can sit in a chair for a couple of hours but can only stand for about twenty minutes.  She can walk two to three blocks but struggles with walking three blocks because of her left foot.  She can lift ten to twenty pounds.  She has trouble bending.  When something falls on the floor at her home, she sets up chairs in descending order of height and transfers herself from one to the other to reach the fallen object.  Afterwards, she may have difficult scooting to a

place where she can pull herself back to the standing position. She has to climb down stairs backwards and cannot climb up more than a few stairs. (Tr. 94-98.)

Vocational expert (VE) Vincent Stock also testified at the hearing. The ALJ requested that the VE outline plaintiff's past work. The VE responded that plaintiff had previously worked as a data entry clerk, which is sedentary work; receptionist, which is sedentary work; switch board operator, which is sedentary work, but performed by plaintiff as medium work; telemarketer, which is sedentary work; CNA, which is medium work, but performed by plaintiff as heavy work; truck loader, which is medium work; and clerk, which is sedentary work. (Tr. 106-07.)

The ALJ presented a hypothetical question concerning an individual, who is 60 years old, with a high school education and the same work experience as plaintiff. The individual can perform sedentary work, and specifically, can lift, carry, push, and pull 10 pounds occasionally, but less than 10 pounds frequently; sit for six hours in an eight-hour work day; and stand or walk for two hours in an eight-hour work day. The individual would be limited to occasional climbing, balancing, stooping, crouching, kneeling, and crawling and could not climb ladders, ropes, or scaffolds, or be exposed to unprotected heights. (Tr. 108.)

The VE responded that such individual would have the transferable skills of filing, communication, and organization. The individual could work as a data entry clerk, which has 3,000 positions in Missouri and 120,000 nationally; receptionist, which has 8,000 positions in Missouri and 320,000 nationally; and telemarketer, which has 10,000 positions in Missouri and 400,000 nationally. The VE also stated that the individual could perform plaintiff's current job. If the individual could not perform jobs with quotas or deadlines, the individual would be unable to perform any of plaintiff's past work. (Tr. 108-110.)

Because there was no medical evidence in the record concerning the right arm, the ALJ ordered an orthopedic examination. On December 14, 2010, the ALJ held a supplemental hearing to hear testimony from Dr. Hutson, who performed the examination. (Tr. 27-45, 103-04.) Dr. Hutson testified as follows. A CT scan on plaintiff's cervical spine shows degenerative disc disease and decreased disk space at C5-C6 and C6-C7.[15] When Dr. Hutson examined plaintiff, she had a slow gait, increased reflexes, pain in the right shoulder, both calves, and the left foot, and was involved in a car accident. She also had some pain and numbness on the bottom of her left foot the last two or three years. Plaintiff told him that she could sit and stand for fifteen minutes and walk two blocks, and that she could lift five to ten pounds with her left arm, but could not carry it. (Tr. 31.)

During the examination, Dr. Hutson found that plaintiff measured 54.5 inches and 187 pounds, and could walk 50 feet with a shuffling gait with no limp and no cane. She could stand but not walk on her tiptoes. She could not kneel, and she could squat to about 30 degrees of knee flexion. There were no issues with her grip and fine finger

---

[15]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman at 2117-18.

function and no atrophy in her hands.  He rated the strength of her right anterior tibial muscle as 5 of 5 but rated her left muscle as 2 of 5 and noted atrophy.  Her right shoulder exhibited a decreased range of motion.  (Tr. 31-32.)

He found that her impairments did not meet or equal a listing in the listing of impairments.  He stated that, by definition, 60 year-old females were unable to do more than light work and that she could perform all postures on an occasional basis, except that she could not climb ladders, ropes or scaffolds, or raise her elbows above her shoulder.  He would also recommend that she avoid concentrated exposure to cold, heat, wetness, humidity, and vibrations, and would prohibit her from working around heights or hazards.  (Tr. 32-34.)

Dr. Hutson examined plaintiff from purely an orthopedic perspective but did not find any reason that her left leg would prevent her from standing for six hours in eight-hour work day.  He found that she had adequate circulation in her legs.  (Tr. 35.)

VE John Grenfell also testified at the hearing.  The ALJ requested that the VE outline plaintiff's past work.  The VE responded that plaintiff had previously worked as a data entry clerk, which is sedentary work; receptionist, which is sedentary work; switch board operator, which is sedentary work; telemarketer, which is sedentary work; and medical aide, which is light work.  (Tr. 38.)

The ALJ presented a hypothetical question concerning an individual, who is 60 years old, with a high school education and the same work experience as plaintiff.  The individual is capable of sedentary work, and specifically can lift, carry, push, and pull 10 pounds occasionally, but less than 10 pounds frequently; sit for six hours in an eight-hour work day; and stand or walk for two hours in the same eight-hour work day.  The individual would be limited to occasional climbing, balancing, stooping, crouching, kneeling, and crawling but could not climb ladders, ropes, scaffolds.  The individual has no use of her right arm for reaching above shoulder level and should not be exposed to moving machinery, unprotected heights, or extreme cold, heat, wetness, or humidity.  (Tr. 38-39.)

The VE responded that such an individual could work as a telemarketer, which has over 800 positions in the St. Louis area; receptionist, which has over 5,000 positions in the area; and data entry clerk, which has over 3,000 positions in the area.  (Tr. 39-40.)

The ALJ then altered the hypothetical question by limiting the individual to low stress work that requires no changes in a routine work setting.  The VE responded that receptionist, telemarketer, and data entry clerk are generally not considered stressful.  As a telemarketer and data entry clerk, production requirements typically cause stress.  For receptionists, meeting people and fielding questions are the main stressors.  The VE stated that if the individual was limited to unskilled work, then plaintiff's past work would be eliminated.  (Tr. 40-41.)

Plaintiff also testified at the supplemental hearing.  She testified that her work hours had been lowered to sixteen hours a week but had since been raised to twenty hours a week.  She continues to take the bus for transportation.  (Tr. 42.)

At her job, she assists the human resources department by filing and occasionally answering the telephone.  She feels very little pressure at her job.  Her boss tells her what she would like to have done and allows her to work at her own pace.  Her employers are aware of her conditions.  Her right arm causes her to make too many typing

errors for her to effectively type. When she tries to type, she is nervous and unable to steady her right arm. Her right hand is swollen, and sometimes she is unable to move it. Her memory has declined, and she repeatedly asks the same questions at work. (Tr. 43-45.)

### III. DECISION OF THE ALJ

On January 27, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 13-20.) At Step One of the prescribed regulatory decision-making scheme,[16] the ALJ found that plaintiff had not engaged in substantial gainful activity since March 8, 2009. At Step Two, the ALJ found that plaintiff's severe impairments were coronary artery disease, status post acute myocardial infarctions, and high blood pressure. (Tr. 15-16.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 16.)

The ALJ considered the record and found that plaintiff has the residual functional capacity (RFC) to perform sedentary work, except that she can only occasionally climb, balance, stoop, crouch, kneel, and crawl, and she can never climb ladders, ropes, or scaffolds. He also found that she must avoid exposure to unprotected heights. (Tr. 16-19.)

At Step Four, the ALJ found that plaintiff was capable of performing past relevant work as a data entry clerk, telemarketer, and receptionist. The ALJ concluded that plaintiff was not disabled. (Tr. 19-20.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942. A five-step regulatory framework is used to determine whether an

---

[16] See below for explanation.

individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues the ALJ erred in (1) failing to consider the entire record; (2) discrediting plaintiff; and (3) failing to find plaintiff's status post stroke as a severe impairment or consider its effect on her RFC.

### A.  Failure to consider the entire record

Plaintiff argues that the ALJ's failure to consider the letter from Brenda Davis, plaintiff's current supervisor, is reversible error. To support her argument, plaintiff relies on Willcockson v. Astrue, 540 F.3d 878 (8th Cir. 2008). In Willcockson, an ALJ's failure to discuss third-party evidence in the written opinion contributed to the Eighth Circuit's decision that the ALJ committed reversible error. Id. at 880. However, in the same case, the Eighth Circuit stated that "failure to [explain the rejection of third-party evidence] does not always result in a remand. For example, we have sometimes concluded that third-party evidence supporting a claimant's complaints was the same as evidence that the ALJ rejected for reasons specified in the opinion. In such circumstances, we have refused to remand based on an 'arguable deficiency in opinion-writing technique' that had no effect on the outcome of the case." Id. Notably, "an ALJ is not required to discuss every piece of evidence submitted." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

Here, the letter from Brenda Davis provided no new material information, but corroborated plaintiff's testimony at the ALJ hearing concerning her current employment, which was considered by the ALJ. (Tr. 42-45, 69-70, 98-99, 318-20.) Furthermore, the ALJ did not discredit the testimony concerning her current employment, but accepted it as true to discredit plaintiff's allegations regarding the severity of her impairments. (Tr. 18.) Accordingly, this court finds that any failure of the ALJ to consider or discuss the letter from Brenda Davis is harmless error.

### B.  Discrediting plaintiff

Plaintiff also argues that substantial evidence did not support the ALJ's finding regarding plaintiff's credibility. Specifically, plaintiff argues that the testimony regarding her current employment should have bolstered, rather than

contradicted, her allegations regarding the severity of her impairments. Although the limited nature of a claimant's employment could validly support a claimant's arguments, the fact that a claimant has worked can also support finding that a claimant is not disabled or not credible. See Tindell v. Barnhart, 444 F.3d 1002, 1006 (8th Cir. 2006); Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); 20 C.F.R. § 404.1571.

Plaintiff also argues that the ALJ erred by relying on an erroneous interpretation of Dr. Hake's statement that plaintiff's deep tendon reflexes were exaggerated. Plaintiff argues that the ALJ interpreted "exaggerated" to mean "fabricated", but that Dr. Hake used "exaggerated" to mean "over-reactive to stimulation." Additionally, plaintiff argues that the ALJ failed to consider her consistent work record.

However, as stated above, this court's role is to determine whether the findings of the ALJ are supported by substantial evidence. Pate-Fires, 564 F.3d at 942. "An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008). An ALJ may also consider the lack of objective medical evidence as a factor for determining credibility. Ford. v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008).

In determining plaintiff's credibility regarding her heart condition, the ALJ considered several medical records that indicated her heart condition was stable. (Tr. 18.) The ALJ also considered the fact that no treating source had found her to have greater work limitations than those assessed in Dr. Hutson's report, which the ALJ afforded great weight. (Tr. 18-19.)

Regarding plaintiff's allegations of post-stroke symptoms, the ALJ noted the inconsistency in the medical record. (Tr. 19.) The ALJ recognized that plaintiff suffered a stroke, and that plaintiff's complaints of right-side weakness, dizziness, and loss of reflex were consistent. (Tr. 19.) However, Dr. Glick commented that plaintiff's symptoms seemed "out of proportion to MRI findings." (Tr. 458.) Additionally, Dr. Morris noted that plaintiff is "capable of normal finger and hand control, although the right hand coordination is slower than the right," and that "there is no atrophy of the hands." (Tr. 489.) Further, Dr. Hutson opined that plaintiff had no limitations regarding the use of her hands and feet. (Tr. 647.)

Regarding plaintiff's allegations of joint pain, the ALJ correctly noted that the record contains no diagnosis explaining the joint pain but contains evidence indicating that plaintiff takes no medication for her joint pain. (Tr. 19.) Finally, although the ALJ discredited plaintiff's allegations of joint pain, during the RFC determination, he considered Dr. Hutson's opinion regarding plaintiff's decreased range of motion in her right elbow and shoulder. (Id.)

In sum, substantial evidence supports the ALJ's determination of plaintiff's credibility.

**C. Status post stroke condition**

Plaintiff argues that the ALJ erred by finding that plaintiff's status-post stroke condition was not a severe impairment. However, if the ALJ considers the challenged impairment in the RFC determination, the failure to find the impairment severe is harmless error. Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006); see also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007); Van Vickle, 539 F.3d at 830-31. Here, the ALJ expressly considered

plaintiff's status-post stroke condition in the RFC determination. (Tr. 19.) Therefore, even assuming that the ALJ erred by failing to consider the condition as a severe impairment, such error is harmless.

Plaintiff also argues that the ALJ erred by failing to find that the condition imposed any additional limitations to her RFC. When determining a claimant's RFC, the ALJ must consider the combined effects of both severe and non-severe medically determinable impairments. 20 C.F.R. § 404.1545(a)(2); <u>Ford</u>, 518 F.3d at 981. However, as stated above, the ALJ supported his credibility finding regarding plaintiff's allegations of post-status stroke condition symptoms with substantial evidence.

## VI.  CONCLUSION

For the reasons set forth above, the court affirms the final decision of the Commissioner of Social Security under Sentence 4 of 42 U.S.C. § 405(g).

An appropriate Judgment Order is issued herewith

.

      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 18, 2013.